# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| BILLEY WINTERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:07CV1604 CAS (AGF) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before the Court for judicial review of the final decision of the

Commissioner of Social Security denying Plaintiff Billey Winters' applications for

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-

434, and supplemental security income ("SSI") under Title XVI of the Act, 42. U.S.C.

§§ 1381-1384f.  The action was referred to the undersigned United States Magistrate

Judge under 28 U.S.C. § 636(b) for recommended disposition.  For the reasons set forth

below, the Court recommends that the decision of the Commissioner be reversed and that

the case be remanded for further proceedings.

Plaintiff, who was born on February 28, 1960, filed his applications for benefits

on November 2, 2005, claiming a disability onset date of June 13, 2003, due to hepatitis

C, bad knees, left hip problems, high blood pressure, carpal tunnel in both wrists, and

foot problems.  (Tr. at 435)  He reported that he stopped working on September 4, 2005,

at the age of 45, because of knee pain.  Id.[1]  After his applications were denied at the

initial administrative level, Plaintiff requested a hearing before an Administrative Law

Judge ("ALJ").  Such a hearing was held on September 19, 2006, at which Plaintiff and a

vocational expert ("VE") testified.  By decision dated December 28, 2006, the ALJ found

that Plaintiff had engaged in substantial gainful activity ("SGA") through 2005, and that

since then, he could not perform his former work but could perform certain sedentary

jobs identified by the VE.  Accordingly, the ALJ concluded that Plaintiff was not

disabled.  Plaintiff's request for review of the ALJ's decision by the Appeals Council of

the Social Security Administration was denied on July 11, 2007.  Plaintiff has thus

exhausted all administrative remedies and the ALJ's decision stands as the final agency

action now under review.

Plaintiff does not dispute the finding that he engaged in SGA through 2005.

Rather, he argues that the ALJ's determination that Plaintiff was not disabled since that

time is not supported by substantial evidence.  Specifically, Plaintiff argues that the ALJ

mischaracterized a medical opinion with regard to Plaintiff's physical impairments, erred

in failing to include limitations due to fatigue and mental impairments in assessing

---

[1]     These were not Plaintiff's first applications for benefits.  On August 21, 2002,
applications for disability insurance benefits and SSI filed by Plaintiff were denied at the
initial administrative level, and his late request for a hearing before an administrative law
judge ("ALJ") was dismissed as untimely.  (Tr. at 25.)  Plaintiff filed new applications for
benefits on March 31, 2003; these applications were denied initially on June 12, 2003, and
Plaintiff did not seek further review.

Plaintiff's residual functional capacity ("RFC"), and erred in discrediting the opinion of one of Plaintiff's treating physicians (Dale Furakawa, M.D.).

**BACKGROUND**

**Work History and Application Forms**

The record indicates that Plaintiff worked as an assembly line worker for approximately ten years, from July 1995 until September 2005. Prior to that job, he worked as a truck spotter for two years, and as a painter in a factory for five years. Id. at 436. Earnings records show annual earnings of under $17,000 through 1995, in the mid to high $20,000s from 1995 through 2002, and approximately $33,000 in 2003, $31,000 in 2004, and $34,000 in 2005. Id. at 295.

**Medical Record**

Plaintiff had two arthroscopic knee surgeries on his right knee and one on his left knee in a span of three years, from February 1996 to February 1999. Id. at 143, 141, 150. A liver biopsy performed on October 19, 1999, showed that Plaintiff suffered from chronic hepatitis C. Id. at 190-91. On May 29, 2001, Plaintiff underwent another operation on his right knee. On a follow-up visit with David Andersen, M.D., on June 6, 2001, Plaintiff was cleared to return to his regular employment on June 16, 2001. Id. at 168-70.

Medical notes dated May 6, 2002, state that Plaintiff had completed 24 weeks of hepatitis C treatment, that Plaintiff complained of lack of motivation, that Zoloft (used to

treat depression and anxiety) was helping him, but that he still had "bad days." Plaintiff was "anxious to return to work." He was released to work half-time and instructed to follow-up in two months. Id. at 180-81. On May 16, 2002, Charles Sincox, M.D., examined Plaintiff and reported that Plaintiff was 6' tall and weighed 237 pounds, had chronic hypertension, was undergoing interferon treatment for his hepatitis C, and was taking Zoloft. Id. at 764.

On October 2, 2002, Plaintiff presented to the ER with a complaint of left hip pain following a fall. It was noted that this hip had been surgically repaired previously after it had been shattered in a motor vehicle accident. An x-ray showed no bony abnormalities and that hardware (presumably from the previous surgery) was in place. Plaintiff was given pain medication and released. Id. at 249-50. Bruce Bacon, M.D., reported to Dr. Sincox by letter dated October 8, 2002, that Plaintiff's hepatitis virus was still present at the end of a 48-week treatment cycle, and that there were no new treatments to offer Plaintiff at that time. Id. at 229.

On January 16, 2003, Plaintiff saw Dr. Sincox, complaining of recent severe headaches and periodic blackouts. Id. at 762. Dr. Sincox referred Plaintiff to a neurologist who examined Plaintiff on February 7, 2003, for "transient alterations of awareness" and reported to Dr. Sincox that the problem might be due to migraines rather than epilepsy. Id. at 241-42.

On questionnaires completed on March 24, 2003, in connection with his application for disability benefits, Plaintiff wrote that he had sharp pains in his knees,

4

aching pains in his left hip, and severe headaches, was extremely tired all the time from his hepatitis C, and was withdrawn from people. His medications included Topamax (an anticonvulsant used to treat migraines), Hydrocodone, Diovan (for hypertension), and Xanax (for anxiety). Id. at 35, 37-40. On the same date, Plaintiff's wife completed a Daily Activities Questionnaire about Plaintiff, in which she stated that Plaintiff had no energy, and was withdrawn, very moody, and always complaining about pain in his joints. Id. at 36.

On March 19, 2003, Plaintiff underwent another arthroscopic procedure to repair a medial meniscus tear in his right knee, and a similar procedure on his left knee on April 30, 2003. Meanwhile, on April 16, 2003, Andrew Matera, M.D., a non-examining state agency physician, completed a Physical RFC Assessment form, indicating that Plaintiff could occasionally lift a maximum of 50 pounds and frequently lift a maximum of 25 pounds; stand for six out of eight hours; sit for six out of eight hours; push and/or pull without limitation; and occasionally climb stairs/ramps, balance, stoop, kneel, and crouch, but never climb a ladder or crawl. Plaintiff had no manipulative, visual, or communicative limitations, but had to avoid concentrated exposure to extreme cold or heat, vibration, and fumes, and moderate exposure to hazards. Id. at 55-62, 77.

Plaintiff saw Joseph Williams, M.D., an orthopedist, on May 21, 2003, for an evaluation of his right knee pain. Dr. Williams noted that Plaintiff's past medical history included hypertension, hepatitis C, depression, panic attacks, a seizure disorder, and bilateral carpal tunnel syndrome. Dr. Williams believed that Plaintiff was too overweight

and too young to be a good candidate for knee replacement, and he recommended continuing conservative treatment.  Id. at 773-74.  On May 27, 2003, Dr. Sincox diagnosed degenerative arthritis in the right knee, and prescribed Hydrocodone for associated pain.  Id. at 760.

On June 11, 2003, psychologist Stanley Hutson, Ph.D., a non-examining state agency consultant, completed a Mental RFC Assessment form and a Psychiatric Review Technique form.  Dr. Hutson indicated in the Mental Assessment that Plaintiff was moderately limited in the ability to carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruption from psychological symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.  Dr. Hutson wrote in narrative form as follows:

> Plaintiff had depression and fatigue, social withdrawal, and cognitive deficits.  He has mild to moderate limitations in concentration, persistence, and pace.  He also has mild to moderate limitations in dealing with the public, coworkers and supervisors, and tends to withdraw and be hard to communicate with.  He has difficulty coping with all of the physical problems and would have frequent upsets in dealing with changes and demands in a work setting.

Id. at 51-52, 65-66.

On the Psychiatric Review Technique form Dr. Hutson indicated that Plaintiff had an affective disorder, a personality disorder, and a substance addiction disorder (alcohol, in remission), all of which resulted in mild limitations in activities of daily living, and moderate limitations in maintaining social functioning and maintaining concentration, persistence, or pace. Referring to the Physical RFC, Dr. Hutson noted that Plaintiff had multiple physical problems and side effects from treatment. He opined that Plaintiff 's personality disorder "did not appear to cause severe limitations for work by history," and that the limitations caused by Plaintiff's depression were "severe" but did not meet or equal the severity of a deemed-disabling mental impairment listed in the Commissioner's regulations. Id. at 63-64, 53-54, 67-76.

On June 28, 2003, Plaintiff went to the ER complaining of chest pain. It was noted that Plaintiff had a panic disorder for which he was taking Zoloft, but no history of cardiac problems. An EKG and other diagnostic tests were normal, and Plaintiff's chest pain was determined to likely be due to his panic disorder. Plaintiff's Zoloft prescription was increased and he was discharged that same day. Id. at 767-69. On August 22, 2003, Plaintiff presented to the ER with abdominal pain. He was given Percocet (Oxycodone) and morphine, diagnosed with diverticulitis, and discharged later that day after the pain subsided. Id. at 709-15, 765.

On February 24, 2004, Plaintiff saw Dr. Williams for right knee pain, and on March 1, 2004, Dr. Williams performed arthroscopic surgery on the knee. Dr. Williams wrote a note advising that Plaintiff would be unable to work until March 15, 2004. Id. at

790-94.  At a postoperative visit on March 18, 2004, Dr. Williams noted that the wound looked good, and that Plaintiff had no problems and minimal pain.  Id. at 788-89.

By mid-May 2004, Dr. Furakawa was Plaintiff's primary care physician.  On May 17, 2004, Plaintiff saw Brian Smith, M.D., at a pain management clinic, upon referral by Dr. Furakawa.  Plaintiff complained of severe pain in his right knee, and less severe pain in his left hip and knee.  According to Dr. Smith, Plaintiff reported on an Oswestry pain questionnaire[2] that he needed some help in personal care, that lifting heavy items aggravated his pain, that he was able to sit in a chair as long as he liked, that he was unable to stand more than one hour or walk more than 1/4 mile, and that he "could travel anywhere without pain."  Dr. Smith observed that Plaintiff (who was 6' tall and weighed 284 pounds) had a brace on his right knee and walked with a right-sided limp.  Plaintiff did not appear to be in acute distress, his affect was normal, and he did not appear depressed or unduly anxious.  Dr. Smith assessed an Oswestry Pain Disability Score of 17/50 ( 34%) (indicating moderate disability), and started Plaintiff on Avinza (sustain-release morphine), Zanaflex (for muscle spasms), and Naprosyn (for pain).  Id. at 532-34.

Between May 29 and June 6, 2004, Plaintiff went to the Emergency Room ("ER") three times for right knee pain, abdominal pain, and back pain.  On each visit, Plaintiff was given medication and released.  Id. at 591, 700, 693.  Meanwhile, Plaintiff continued

---

[2]     The Oswestry test rates an individual's perception of his functional limitation related to lower back pain.  Scores of 10% to 20% reflect minimal disability; scores of 20% to 40% reflect moderate disability; and scores of 40% to 60% reflect severe disability.

to see Dr. Smith monthly for pain management. At the June 14, 2004 visit, Plaintiff reported 75% ("near complete") relief from the pain medications Dr. Smith had prescribed. Id. at 53-31. On July 19, 2004, Plaintiff told Dr. Smith that he had good pain control with his medications, but that he was depressed and thought this might be due to the medications. Dr. Smith again noted that Plaintiff's right knee was braced and that he walked with a right-sided limp. Noting that Plaintiff appeared depressed and was on an antidepressant prescribed by Dr. Furakawa, Dr. Smith switched Plaintiff from Avinza to Duragesic; after Plaintiff reported at his next visit (on August 18, 2004) that his pain control was not as good, Dr. Smith prescribed a generic MS Contin (oral morphine). Id. at 526-29.

On September 9, 2004, Plaintiff reported that his pain medications were providing 80% relief, and Dr. Smith prescribed MSIR (oral morphine) in addition to the MS Contin for "breakthrough pain" Plaintiff was experiencing at the end of his workday, and told Plaintiff to return in two months. Id. at 524-25. Plaintiff next saw Dr. Smith on December 1, 2004. The progress notes again state that Plaintiff reported 80% pain relief from his medications, which Dr. Smith continued. Id. at 522-23.

By letter dated January 17, 2005, Dr. Bacon wrote to Dr. Sincox that Plaintiff was seen for follow-up with regard to his hepatitis C, which had relapsed at the end of 48 weeks of treatment. Dr. Bacon said that Plaintiff was doing well and had no complaints relating to that illness. Dr. Bacon noted that at the time there were no new treatments to

offer Plaintiff, but that studies were being conducted for patients who had relapsed, and that Plaintiff was told to return in six months. Id. at 731.

Plaintiff saw Dr. Smith on February 16 and March 16, 2005, for continued pain management. At his visit in February, Plaintiff was tapered off his MS Contin, because it was making him too drowsy. Id. at 520-21. However, at his March visit, Plaintiff reported that he did not have adequate pain control, and MS Contin was restarted at a lower dose. Id. at 519. On March 23, 2005, Plaintiff saw W. Chris Kostman, M.D., an orthopedist, to evaluate treatment options for his right knee. Dr. Kostman noted that Plaintiff had exhausted many available non-surgery options including injections, physical therapy, and bracing. Dr. Kostman felt that it would be best if further knee surgery could be put off for five to ten years, and recommended weight loss at this point, which Dr. Kostman believed might improve Plaintiff's symptoms "significantly." Id. at 622-23.

On April 13, 2005, Plaintiff reported to Dr. Smith that his pain was unchanged since his last visit. Plaintiff described his pain, which he experienced mostly in the afternoon and evening, as shooting, throbbing, and sharp, and reported that he had to use "a reasonable amount" of breakthrough medication. Nevertheless, the progress notes repeat the entry that Plaintiff felt 80% and "near complete" relief from his medications. Id. at 516-17. On May 11, 2005, Dr. Smith continued Plaintiff on MS Contin and MSIR, which were giving Plaintiff "reasonable control" of his pain. Id. at 514-15.

On June 29, 2005, Dr. Kostman gave Plaintiff a cortocosteroid injection for his right knee, and opined that Plaintiff's right knee would most likely require a total knee

arthroplasty because of involvement of both the medial joint line and the patellofemoral joint.  Id. at 621.  Plaintiff saw Dr. Poetz on July 15, 2005, for evaluation of work-related injuries occurring on January 18, 2003.  Upon physical examination and a review of Plaintiff's past medical history, Dr. Poetz concluded that Plaintiff had a 40% permanent disability to the right knee, pre-existing; 35% permanent disability to the right knee due to the injury of January 18, 2003; 25% permanent disability to the left knee, pre-existing; 33% permanent disability to the left knee due to the injury of January 18, 2003; 40% permanent disability to the left hip; 15% permanent disability to the left wrist; 35% permanent disability to the left hand and wrist; 40% permanent disability to the right hand and wrist; and 15% permanent disability to the body as a whole due to hepatitis.  Dr. Poetz further opined that the combination of these disabilities resulted in a total that "exceeds the simple sum by 20%," and that Plaintiff was permanently and totally disabled, and would remain permanently and totally unemployable.  Id. at 657-64.

Plaintiff saw Dr. Smith on August 10, September 7, September 12, and October 5, 2005, for continued pain management.  At the September 7 visit, Dr. Smith switched Plaintiff to OxyContin, and at the October 5 visit, Dr. Smith instructed Plaintiff to return in three months for further evaluation.  Id. at 506-10.  On October 19, 2005, Plaintiff saw Dr. Kostman again, who noted that x-rays revealed varus deformity that might respond

well to a high tibial osteotomy (surgery in which the bone is cut and then realigned) and such a procedure was scheduled.  Id. at 620.[3]

On December 15, 2005, Dr. Bacon wrote to Dr. Furukawa with an update similar to the one sent to Dr. Sincox on January 17, 2004, namely that Plaintiff was "doing fairly well," with his hepatitis C and that no new treatments were available.  Id. at 468.

Also on December 15, 2005, non-examining consultant A. Carwile[4] completed a Physical RFC Assessment form covering the period of November 1, 2005, to the date of the assessment.  The form indicates that Plaintiff could lift and/or carry a maximum of ten pounds; stand for six out of eight hours; sit for six out of eight hours; push and/or pull without limitation; and occasionally climb stairs/ramps, kneel, crouch, and crawl; but could never climb ladders, ropes, or scaffolds.  Plaintiff had no manipulative, visual, or communicative limitations, but had to avoid concentrated exposure to vibration and hazards, such as machinery and heights.  It was believed that Plaintiff's allegations that he did could not walk more than 50 feet or stand longer than one and one-half hours (at a time) were consistent with the medical evidence on file and were credible.  Id. at 406-13.

Plaintiff saw Dr. Smith again on December 28, 2005, at which time Dr. Smith continued current medications and added Percocet.  Id. at 503-04.  Plaintiff went to the ER

---

[3]     Although it is unclear from the medical records what occurred regarding this surgery, Plaintiff did testify at the hearing that a knee surgery scheduled for December 2005 was cancelled because insurance would not pay for it, as noted below.

[4]     The typed name "A. Carwile" (without "M.D." or "D.O.") appears in the space for the signature of a medical consultant.

on December 30, 2005, and January 4, 2006, presenting with abdominal pain on both occasions. X-rays showed that Plaintiff was suffering from diverticulitis. Plaintiff was prescribed an antibiotic and told to take his prescribed pain relievers. Id. at 570-71.

On January 12, 2006, Plaintiff voluntarily admitted himself to a hospital for depression and opioid dependency. At admission, Plaintiff was diagnosed with major depressive disorder, opioid dependency, and a Global Assessment of Functioning ("GAF") of 25.[5] Id. at 543-44. The date of discharge is not reflected in the record, but on January 24, 2006, Plaintiff presented to the hospital again due to an increase in depressive symptoms. He was admitted to the hospital with a diagnosis of major depressive disorder and a GAF score of 37. The intake assessment noted that Plaintiff had not worked since November 11, 2005, when he went on medical leave, and that he lived with his wife of 15 years and their three teenage sons. Plaintiff was discharged on January 28, 2006, on antidepressant medication, and was instructed to follow-up with his primary care physician. Upon discharge, Plaintiff's GAF was rated at 50. Id. at 536-44.

Plaintiff saw Dr. Smith on January 30, 2006, and expressed his desire to stop taking OxyContin. Plaintiff reported that he had tried to stop abruptly and had developed

---

[5]  A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate "[s]ome impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

withdrawal symptoms.  Dr. Smith told Plaintiff that he would need to taper off use of the drug over a period of several months.  Id. at 501-02.  Plaintiff saw Dr. Smith on February 27, March 23, and April 20, 2006, for continued treatment of his pain management with relatively little change in his treatment.  Id. at 495-500.

On May 31, 2006, Plaintiff met with vocational rehabilitation counselor Timothy Lalk, who issued a Vocational Rehabilitation Evaluation on July 7, 2006.  Mr. Lalk noted that Plaintiff appeared tired and sad throughout the interview.  Based upon the interview, and his rather extensive review of Plaintiff's medical records, Mr. Lalk opined that Plaintiff was credible and that Plaintiff would not be able to secure and maintain any type of full-time work, even at the sedentary level or at a job that would permit him to sit and stand throughout the workday.  Mr. Lalk did not believe that any employer would hire Plaintiff due to his mood and appearance of fatigue, of being under strain, and of experiencing discomfort when walking, standing, and changing positions.  Id. at 480-93.[6]

On a Physician's Assessment form dated July 14, 2006, Dr. Bacon stated that Plaintiff suffered from chronic hepatitis C, with symptoms including chronic fatigue, and aches and pains.  Dr. Bacon opined that Plaintiff's symptoms might restrict his daily activities and his ability to do sustained work-related activities such as prolonged sitting, standing, walking, and lifting objects in excess of five pounds; and maintaining attention

---

[6]    Mr. Lalk refers to an evaluation of Plaintiff conducted on July13, 2005, by a Dr. Ralph, who believed that Plaintiff could work without restrictions, except perhaps at repetitive tasks.  The record before the Court does not contain such a report, nor did the ALJ or either party refer to it.

and concentration, and dealing with ordinary work stresses, on a day-in and day-out basis. Dr. Bacon further opined that Plaintiff would probably need to rest four to five times for 15 to 30 minutes each time, during an eight hour work day. Dr. Bacon opined that Plaintiff "might be able to work a sedentary level job," but that his "abilities were significantly limited in being able to work more than a sedentary job." Id. at 467.

Also on July 14, 2006, Dr. Furakawa, Plaintiff's primary care provider for over two years, completed an assessment form stating that Plaintiff suffered from chondromalacia (anterior knee pain) and degenerative joint disease in his right knee, with symptoms of constant pain, decreased range of motion, stiffness, crepitation, and swelling of the knee. Dr. Furakawa opined that Plaintiff's symptoms restricted his ability to sustain work-related functions such as sitting, standing, and stooping, and that Plaintiff was unable to perform sedentary work, due to his constant pain. Id. at 449.

Plaintiff saw Dr. Furakawa on August 4, 2006, for follow-up. In a letter "To Whom It May Concern," Dr. Furakawa stated that Plaintiff continued "to have ongoing issues with pain and weakness and decreased motion on his knees" despite treatment with medications, exercise and strengthening regiments, and that he (Dr. Furakawa) did not see any hope for Plaintiff to improve in the future. Id. at 447.

**Evidentiary Hearing of September 19, 2006**

Plaintiff testified that he was 46 years old, had a GED, and had worked as an assembly line worker at an automotive plant, a painter of office furniture, a truck spotter driving trucks into dock doors, and a laborer installing swimming pools. Plaintiff

acknowledged that although he had alleged a disability onset date of June 13, 2003, he had

annual earnings of a little over $30,000 in each of 2003, 2004, and 2005.  Plaintiff's

counsel explained that June 13, 2003, was the date after "a prior appeal denial," and that

"a lot" of the taxable wages shown on payroll records represented sick leave.  Counsel

posited that the earnings after June 13, 2003, were either less than the amount constituting

SGA, or represented unsuccessful work attempts.  Id. at 840-43.

Plaintiff testified that he had had a substance addiction, "mainly alcohol," in the

past, but that he had not had a drink in the six or seven years since his stay at a treatment

facility.  Upon further questioning by the ALJ, Plaintiff also acknowledged that he had

been hospitalized within the past year for opioid (Oxycontin) dependence.  He testified

that he had been scheduled to get a partial knee replacement in December 2005, but the

surgery was cancelled because his insurance would not cover it.  He stated that he had a

pending workers' compensation claim that involved a 2003 work-related injury to his right

knee.  Id. at 843-46.

Plaintiff reported that he currently experienced "a lot of pain" in his right knee, "a

lot of popping, locking up, swelling, real sharp pain."  He also had pain and tightening in

his left hip, fatigue due to hepatitis, and headaches if he did not take his blood pressure

medication.  Plaintiff testified that even on medication, his blood pressure was still

"borderline high."  Id. at 846-47.

Plaintiff testified that he had not been at what he considered to be his normal

weight of 250 to 260 since 1998 or 1999, and that his extra weight did not cause any

difficulties that he knew of with his knees.  Plaintiff noted that he had pain in his lower back when he sat for long periods of time.  He also testified that he was "still depressed all the time, withdrawn," for which he was taking prescribed medications.  He stated, however, that since he left the hospital (on January 28, 2006), he had not followed up with a psychiatrist or psychologist.  Id. at 847-49.

Upon questioning by his counsel, Plaintiff testified that during his last two years of work (1993-1995), his co-workers would allow him to take the easiest jobs in the plant because they knew his "condition," and that at those jobs, he would sit for about one-third of the day.  He testified that he drove about three times a week, and that the longest distance he drove without a break was 40 to 45 miles.  He could walk a couple of city blocks without a break, stand for about one-half hour before his knees and hips began to hurt, sit for about one-half hour at a time, and lift and carry ten pounds.  Plaintiff testified that he rarely climbed stairs, bent, or stooped.  Id. at 849-53.

Plaintiff testified that a normal day consisted of waking up at about 11:00 a.m. to noon, watching television in bed for a couple of hours, and then going into the front room to watch more television.  He only took brief showers, went to bed around midnight to 1:00 a.m., and only got about four or five hours of sleep a night because of pain, discomfort, and "sleeplessness."  Plaintiff testified that he did not do household chores and that he napped frequently.  On a scale of one to ten, he rated his right knee pain as a six to seven with medication, and an eight to eight and one-half after activity; his left hip

pain as a five to five and one-half when doing nothing, and a six to six and one-half after activity; and his lower back pain as a six.  Id. at 853-54.

The ALJ posed two hypothetical questions to the VE, based on the RFC assessments of  "the state doctors."  The VE was first asked to assume an individual with the same vocational factors as Plaintiff (age, education, work experience), who could lift and carry 50 pounds occasionally and 25 pounds frequently; sit for six hours out of eight; stand or walk for six hours out of eight; and occasionally climb stairs, balance, stoop, crouch, and kneel; could never crawl or climb ropes, ladders, or scaffolds; should avoid concentrated exposure to extreme cold and heat, vibration, fumes, and odors; should avoid moderate exposure to the hazards of moving and dangerous machinery and unprotected heights; was able to understand, remember and carry out at least simple instructions on non-detailed tasks and respond appropriately to supervisors and co-workers in a task-oriented setting; could only tolerate infrequent contact with others; and could adapt to routine, simple work changes.[7]  The VE was asked whether this person could perform any of Plaintiff's past relevant work, and the VE testified that he did not think so. The VE testified, however, that such a person could perform other jobs, such as cashiering (light work) and some assembly work (light, unskilled work), both of which existed in significant numbers locally and nationally.  Id. at 857-58.

_____

[7]    The physical capacities in this hypothetical match those in the April 16, 2003 physical RFC assessment of Dr. Matera.  (Tr. at 55-62.)

The ALJ next asked the VE to assume a second hypothetical individual who could lift ten pounds occasionally; sit for six hours out of eight; stand or walk for six hours out of eight; occasionally climb stairs, but never ropes, ladders, or scaffolds; could occasionally crouch, kneel, and crawl; should avoid concentrated exposure to vibration, and the hazards of moving dangerous machinery; and had "the same psychological restrictions as in the previous hypothetical."[8] The VE testified that such a person could perform sedentary jobs,[9] giving the examples of lampshade assembler, order clerk, and food and beverage worker, all of which existed in significant numbers locally and nationally. The VE further testified that adding the need for a sit/stand option would preclude only a small percentage of these jobs. Id. at 858-59.

---

[8] The physical capacities in this hypothetical match those in the December 15, 2005 physical RFC assessment of A. Carwile. (Tr. at 406-13.)

[9] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

> "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday. . . . In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals.

Social Security Ruling (SSR) 96-9p, 1996 WL 374185, at *6-7 (July 2, 1996).

Plaintiff's counsel asked the VE to assume a hypothetical individual with Plaintiff's vocational factors who was able to walk a maximum of two blocks/30 minutes, sit for 30 minutes, and lift ten to 15 pounds occasionally; experienced "a significant degree of chronic pain" despite medication, which "at least at significant times" would interfere with attention and concentration; and experienced chronic fatigue, which required frequent rest periods at will at any time throughout the day. The VE testified that there were no jobs such an individual could maintain. Id. at 860.

**ALJ's Decision of December 28, 2006**

The ALJ determined that Plaintiff had engaged in SGA from his alleged disability onset date (June 3, 2003) through 2005, but had not done so after 2005. The ALJ then found that Plaintiff suffered from the severe impairments of degenerative disease of the knees and hips, hepatitis C, depression, and "spells" of unknown etiology. The ALJ found, however, that Plaintiff did not suffer from an impairment or combination of impairments of a severity that met or medically equaled any deemed-disabling impairment listed in the Commissioner's regulations. Id. at 13-14, 18.

The ALJ proceeded to assess Plaintiff's RFC, referring to Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984), as setting forth the relevant factors in evaluating the credibility of a disability claimant's subjective complaints. The ALJ noted that during the course of Plaintiff's treatment for pain, his pain-management treating specialists "frequently" observed that he was in no acute distress. The ALJ stated that those observations were consistent with the ALJ's own observations of Plaintiff at the

evidentiary hearing where, according to the ALJ, Plaintiff "had a normal appearance and demeanor [and] he was not distracted by pain or other symptoms."  Id. at 14.

The ALJ also observed that although Plaintiff had been advised to lose weight in order to be a better candidate for knee replacement surgery and to improve his symptoms, at the time of the hearing Plaintiff still weighed close to 300 pounds.  The ALJ believed that this evidenced a failure to follow prescribed medical treatment, which was inconsistent with complaints of a disabling condition.  "It would seem that if the claimant found his symptoms to be as disabling as alleged that he would be motivated to lose weight in order to alleviate his symptoms."  The ALJ noted that he was not denying Plaintiff's claim because Plaintiff failed to follow the advice that he lose weight, but rather was considering this as a factor bearing upon Plaintiff's credibility.  Id. at 15 & n.3.

Referencing the records from the pain management clinic, the ALJ stated that the evidence showed that Plaintiff "usually experienced 80% pain relief with specialized pain treatment."  The ALJ reasoned that impairments which are "controllable or amenable to treatment do not support a finding of total disability."  The ALJ believed that Plaintiff's "documented abuse of pain medication" also reflected negatively upon Plaintiff's credibility.  The ALJ found that Plaintiff's hepatitis C did not keep him from working in the past, indicating that it was not "completely debilitating." The ALJ acknowledged that "at times," Plaintiff had had "some" depression and/or anxiety, but that in the treatment setting, "psychiatric examinations were usually within normal limits without the appearance of depression or undue anxiety."  The ALJ concluded that Plaintiff did not

have depression or anxiety for 12 continuous months that interfered with his ability to work.  Id. at 15.

The ALJ pointed to Dr. Williams' March 18, 2004 post-operative notes that the wound from Plaintiff's right knee surgery looked good.  The ALJ characterized these notes as stating that Plaintiff had "minimal problems and no pain," which the ALJ believed was not consistent with a finding that Plaintiff's knee impairment and resulting pain precluded working for 12 continuous months.  The ALJ believed that there was a conflict between Dr. Furakawa's statement of July 14, 2006, that pain prevented Plaintiff from even sedentary work, and Dr. Bacon's opinion on the same date that Plaintiff could perform sedentary work.  The ALJ stated that he resolved the conflict in favor of finding that Plaintiff could engage in sedentary work activities.  Id. at 15-16.

The ALJ believed that Dr. Williams' opinion that Plaintiff could return to work two weeks after the March 1, 2004 right knee surgery was not consistent with an inability to perform even sedentary work, and that this opinion from the treating surgeon was entitled to more weight than Dr. Poetz's opinion (dated July 15, 2005) that Plaintiff was totally and permanently disabled, as Dr. Poetz had only seen Plaintiff once.  Furthermore, according to the ALJ, Plaintiff's statements in treatment settings, such as his statements (on the May 17, 2004 pain questionnaire) that sitting was not a problem and that he could travel without pain, were consistent with an ability to do sedentary work, and were entitled to more weight than statements made "for compensation purposes."  Id. at 16.

Additionally, the ALJ stated that Drs. Poetz and Furakawa, in finding that Plaintiff was unable to engage in sedentary work and was disabled, "essentially accepted" Plaintiff's allegations as fully credible, allegations which the ALJ did not find to be fully credible. The ALJ concluded that Plaintiff could not engage in prolonged standing and walking, and heavy lifting and carrying, but that he had the RFC to lift and carry up to ten pounds; sit and stand for eight hours each and walk for six hours in an eight-hour workday; remember and carry out simple, routine instructions; have infrequent contact with others; adapt to simple, routine work changes; and occasionally crouch and crawl. Plaintiff could never climb ropes, ladders, or scaffolds; and had to avoid concentrated exposure to vibration and dangerous moving machinery and unprotected heights. Id. at 16.

The ALJ found that Plaintiff could not perform his past relevant work, but that based upon the VE's testimony, he could work as a sedentary assembler and sedentary order clerk, and was thus, not disabled. The ALJ added that Mr. Lalk's opinion that Plaintiff was not a candidate for vocational rehabilitation, was based on Mr. Lalk's own credibility and RFC determinations and upon hiring factors that were irrelevant to a Social Security disability decision, and was thus not "case dispositive." Id. at 17.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th

Cir. 2005) (citation omitted).  This "entails 'a more scrutinizing analysis'" than the substantial evidence standard.  Id. (quoting <u>Wilson v. Sullivan</u>, 886 F.2d 172, 175 (8th Cir. 1989)).  The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'"  Id.  (quoting <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)).  Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'"  Id. (quoting <u>Shannon v. Chater</u>, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months.  <u>Barnhart v. Walton</u>,  535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability.  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments.  A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities.

20 C.F.R. § 404.1521(a).  In evaluating the severity of mental impairments, the ALJ must make specific findings as to the degree of limitation in each of the following functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).

If the claimant does not have a severe impairment or combination of impairments that meets the duration requirement, the claim is denied.  If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix 1 of 20 C.F.R. part 404, Subpart P.  If the claimant's impairment is equivalent to a listed impairment, the claimant is conclusively presumed to be disabled.  Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any.  If the claimant has past relevant work and is able to perform it, he is not disabled.  If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages,

educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category due to nonexertional impairments such as pain or depression, the Commissioner cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE.

In order to constitute substantial evidence upon which to base a denial of benefits, the testimony of a VE that there are jobs a person with the claimant's limitations could perform must be in response to a hypothetical question which "captures the concrete consequences of the claimant's deficiencies." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001).

**Arguments of the Parties**

As noted above, Plaintiff does not challenge the ALJ's determination that Plaintiff had engaged in SGA through 2005.[10] Plaintiff also states that, while not agreeing with it, he is not challenging the ALJ's assessment of Plaintiff's credibility. Rather, Plaintiff argues that the ALJ's decision that Plaintiff was not disabled (since 2005) was not supported by the medical record. Plaintiff contends that the July 14, 2006 opinions of Drs. Bacon and Furakawa are consistent in that both indicate that Plaintiff cannot perform

---

[10] The Court notes that under the Commissioner's regulation, a claimant is presumptively engaged in SGA if the claimant's average earnings equal or surpass the larger of (a) the previous year's earnings, or (b) an amount calculated using a formula incorporating the national average wage index. 20 C.F.R. § 404.1574(b)(2) (earnings of more than $500 per month will ordinarily show the claimant engaged in SGA).

sedentary work. Plaintiff argues that the ALJ's perceived conflict between the two opinions was due to a misreading of Dr. Bacon's opinion. Whereas the ALJ read Dr. Bacon's assessment to state that Plaintiff could engage in sedentary work, Dr. Bacon actually stated that Petitioner "might be able to" work at a sedentary job and would probably need to rest four to five times, for 15 to 20 minutes each time, during an eight-hour work day, limitations which were not included in the RFC, and hence in the questions presented to the VE. Furthermore, the opinions were not inconsistent, according to Plaintiff, because Dr. Bacon was considering the effects of Plaintiff's hepatitis C on Plaintiff's ability to work, and Dr. Furakawa was considering the effects of Plaintiff's knee problems.

Plaintiff also contends that the ALJ's RFC determination was flawed for failing to include any limitations due to Plaintiff's fatigue described by Dr. Bacon, whose opinion the ALJ seemingly endorsed. In addition, Plaintiff faults the ALJ for not including in the RFC the mental limitations found by Dr. Hutson's evaluations, evaluations the ALJ also appeared to adopt. Lastly, Plaintiff argues that the ALJ improperly discredited Dr. Furakawa's July 14, 2006 opinion that Plaintiff's degenerative knee disease restricted Plaintiff's ability to sustain work-related functions such as sitting, standing, and stooping, and that Plaintiff was unable to perform sedentary work due to his pain.

The Commissioner first argues that the ALJ properly found that Plaintiff was not fully credible. The Commissioner then focuses on Plaintiff's main argument that the ALJ's RFC assessment was flawed and not supported by the medical record. The

Commissioner maintains that the ALJ properly found that Dr. Furakawa's opinion was not supported by the evidence, repeating the ALJ's reasoning that the opinion appeared to be based largely on Plaintiff's subjective complaints, that Dr. Williams felt Plaintiff could return to work two weeks after the March 1, 2004 surgery, and that the records from the pain clinic consistently showed that Plaintiff received "near complete" pain relief with medication.

With respect to Plaintiff's complaint that the ALJ's RFC assessment did not include any limitations due to fatigue, the Commissioner argues that Dr. Bacon's notes do not reflect any complaints of fatigue since 2002. The Commissioner argues in addition that the ALJ properly accorded no weight to Dr. Poetz's opinion regarding Plaintiff's disabilities because Dr. Poetz only examined Plaintiff once, and because Plaintiff was still performing SGA at the time of that examination. Lastly, the Commissioner contends that the ALJ was not bound by Dr. Hutson's opinion as to Plaintiff's limitations due to mental impairments, because Dr. Hutson was a state agency (non-examining) consultant, and his opinions did not relate to the time period at issue in this case.

**ALJ's RFC Determination**

Upon careful review of the record and the arguments of the parties, the Court agrees with Plaintiff that the ALJ's assessment of Plaintiff's physical and mental RFC is not adequately supported by the medical record. A disability claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). In <u>McCoy v. Schweiker</u>, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as

the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001)). The ALJ is therefore required to consider at least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Here, the ALJ's assessment of Plaintiff's physical limitations did not comport with the medical opinions of Drs. Bacon, Furakawa, and Poetz. The ALJ discredited Furakawa's July 14, 2006 opinion that Plaintiff's degenerative joint disease in his right knee restricted Plaintiff's ability to sustain work-related functions such as sitting, standing, and stooping, and that Plaintiff was unable to perform sedentary work due to his knee pain. The weight to be given to a medical opinion is governed by a number of factors

including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d). The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(d)(2).

One reason given by the ALJ for not crediting Dr. Furakawa's opinion was that it was inconsistent with Dr. Bacon's opinion. The Court agrees with Plaintiff that this was not a fair reading of the record. Dr. Bacon only stated that Petitioner "might be able to" work at a sedentary job; and Dr. Bacon was considering the effects of Plaintiff's hepatitis C on Plaintiff's ability to work, whereas Dr. Furakawa was considering the effects of Plaintiff's knee problems. A further problem with the ALJ's decision on this matter is that while he said he favored Dr. Bacon's opinion, the ALJ did not include in the questions to the VE Dr. Bacon's belief that Plaintiff would "probably" need to rest four to five times, for 15 to 20 minutes each time, during an eight-hour work day.

Another reason given by the ALJ for giving Dr. Furakawa's opinion little weight was that, according to the ALJ, it was based upon Plaintiff's subjective complaints, complaints which the ALJ did not find credible. But, as Plaintiff argues, Dr. Furakawa noted objective findings including decreased range of motion, stiffness, crepitation, and swelling, besides Plaintiff's complaints of pain. When Dr. Furakawa offered the opinion

30

in question, he had been Plaintiff's primary care physician for over two years.  Cf. Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) (finding that the medical opinion of a treating physician was not entitled to controlling weight because the Plaintiff had only met with the physician on three prior occasions).

The ALJ's statement that Dr. Williams' June 6, 2001 opinion, that Plaintiff would be able to return to work two weeks after his surgery one week prior, was inconsistent with an inability to do sedentary work, is troubling in light of the time frame of Dr. Williams' opinion.  Plaintiff indeed did return to work after that surgery, but the medical record shows continued problems with Plaintiff's knees.  Similarly problematic is the ALJ's discounting Dr. Poetz's July 15, 2005 opinion, that Plaintiff was totally and permanently disabled, as deserving less weight than Dr. Williams' opinion from one year earlier.  Although Dr. Poetz's opinion was based only on a one-time examination, it supports Plaintiff's allegations and the opinions of Drs. Bacon and Furakawa, and the ALJ did not give a valid reason for discounting it, nor does the Court discern any.

There may have been some valid reasons for questioning the medical opinions of Drs. Bacon, Furakawa, and Poetz, each viewed individually, with regard to Plaintiff's physical limitations.  But when viewing the record as a whole, the Court does not believe that the ALJ had an adequate basis to reject these opinions in favor of the opinions of the state agency consultants, Dr. Matera and A. Carwile (assuming he or she is a physician).  Furthermore, where, as here, an ALJ does not give controlling weight to the opinions of treating sources such as Drs. Bacon and Furakawa, but rather relies upon the opinion of a

state agency consultant, the Commissioner's regulations require the ALJ to explain the weight given to the consultant.  See 20 C.F.R. § 404.1527(f)(2)(ii).  The ALJ's failure to do so here supports the Court's decision that the Commissioner's decision must be reversed and the case remanded.  See Willcockson v. Astrue, No. 07-3757, 2008 WL 3927277, at *2 (8th Cir. Aug. 28, 2008) (reversing and remanding for further consideration where the ALJ did not explain why he relied on the RFC assessment of a state agency consultant; "By explaining the weight given [the consultant's] assessment, the ALJ would have both complied with the regulation and assisted [the Court] in reviewing the decision.").

As Plaintiff acknowledges, the ALJ's RFC determination did include some limitations due to mental impairment, namely the inability to perform work requiring more than infrequent contact with others; remembering and carrying out more than simple routine instructions; and adapting to more than simple, routine work changes.  As Plaintiff argues, however, this does not reflect the full extent of limitations found by Dr. Hutson on June 11, 2003.  The Court finds the Commissioner's arguments as to why the ALJ was entitled to discount Dr. Hutson's opinions unpersuasive.

The ALJ himself did not explain his reasoning on this matter.  It is true that the Commissioner's regulations provide that more weight is generally to be given to the opinion of an examining source than to the opinion of a non-examining source.  See 20 C.F.R. § 404.1527(d)(1).  But here, Dr. Hutson's mental evaluations were the only medical opinions in the record related to Plaintiff's mental RFC.  Although his evaluations

did predate the relevant time frame, there is little indication in the record that Plaintiff's mental impairments significantly improved since that time. In fact, in January 2006, Plaintiff was diagnosed with major depressive disorder. If the ALJ felt that Dr. Hutson's opinions were dated, the ALJ should have assured that a more current medical evaluation of Plaintiff's mental condition was in the record. See, e.g., Snead v. Barnhart, 360 F.3d 834, 839 (8th Cir. 2004) (reversing and remanding for ALJ to develop the record regarding whether claimant's heart condition may have affected claimant's ability to work where there was no evidence undermining claimant's physician's report that claimant could do no work).

In sum, the Court recognizes that it is generally for the ALJ to assess the record and determine the weight to be accorded to treating physician's opinions, and that a court should "disturb the ALJ's decision only if it falls outside the available 'zone of choice.'" See, e.g., Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (citations omitted). But, while the question might be close, the Court believes that reversal and remand are required here. See Willcockson, 2008 WL 3927277, at *1 ("Several errors and uncertainties in the [ALJ's] opinion, that individually might not warrant remand, in combination create sufficient doubt about the ALJ's rationale for denying [the Plaintiff's] claims to require further proceedings . . . .").

In reconsidering Plaintiff's RFC on remand, Plaintiff's mental and physical impairments must be considered in combination. See 20 C.F.R. § 404.1523; Social Security Ruling 96-8p, 1996 WL 374184, at *5 (when assessing an individual's RFC, the

ALJ "must consider an individual's impairments, even those that are not 'severe'"; when considered in combination, "the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do"); <u>Cunningham v. Apfel</u>, 222 F.3d 496, 501(8th Cir. 2000) (holding that the ALJ must consider "the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling"). The ALJ should also consider the need to develop the record with respect to Plaintiff's work-related functional limitations due to mental problems during the relevant time period.

## <u>CONCLUSION</u>

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that the case be **REMANDED** for further consideration consistent with this Report and Recommendation.

The parties are advised they have eleven (11) days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained**.**

*Audrey G. Fleissig*
_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 2nd day of September, 2008.